In the Matter of the Petition of **NUECES COUNTY, TEXAS, ROAD DISTRICT NO. 4, Owner of the Oil Screw Nellie B, for Exoneration from or Limitation of Liability in a Cause of Limitation of Liability.**

The NELLIE B.

A. B. No. 184.

United States District Court
S. D. Texas,
Corpus Christi Division.
June 10, 1959.

T. G. Schirmeyer, L. G. Kratochvil, Houston, Tex., for claimants.

Franklin Smith, County Attorney, Nueces County, Texas, Kleber, Mobley, Lockett & Weil, Corpus Christi, Texas, for petitioner, Nueces County, Texas, Road District No. 4.

ALLRED, District Judge.

On April 20, 1956, Samuel J. Thomas drove his Chrysler Sedan on board the Nellie B, a ferryboat owned and operated by Nueces County Road District No. 4 (hereafter called Road District). Thomas was accompanied by his wife, Inez, and by his brother, Leo, and Leo's wife, Lena May Thomas. The Thomases had gone aboard the ferry as fare paying passengers to be conveyed across navigable waters from a landing slip at

Harbor Island, Texas, to Aransas Pass on Mustang Island.

Thomas drove his automobile in a normal manner into the center lane as directed by a ferry deckhand and stopped forward of the wheelhouse in the center lane. Thereafter the deckhand directed Thomas to move forward without giving him specific directions as to how far to go or where or when to stop. Thomas drove the car forward slowly and, apparently without using his brakes or stopping, ran into two sagging cables hanging across the end of the vehicle runways at the seaward end of the ferry. A defective pin in one of the shackles holding the cables sheared and the car plunged into the water, submerging with the four passengers. The two women were trapped in the car and drowned immediately. The two Thomas brothers managed to free themselves from the car and tried to swim to safety. Leo Thomas was finally rescued and survived but S. J. Thomas, although having been hauled to shore and administered artificial respiration, died a short time after his wife was drowned.

Thereafter an admiralty proceeding was filed in this court, against the Road District (A.D. 179), by Leo Thomas, individually (for the death of his wife and for his personal injuries) and by Fay Thomas Whitford (a daughter of Samuel and Inez B. Thomas), individually and as administratrix of the estate of her parents. A total of $114,000 damages was sought. Thereupon the Road District instituted this proceeding for exoneration from, and/or limitation of, liability, claiming the benefit of sections 183–186 of 46 U.S.C.A., and the various statutes, acts and rules supplementary thereto.

The Road District alleged that the Thomas tragedy was not caused, or contributed to, by any fault, neglect or want of care on the part of the Nellie B, or those in charge of her, or of the petitioner, but was solely due to fault and neglect on the part of the occupants of the automobile, particularly the driver, Samuel J. Thomas; that the accident occurred and the losses and damages resulted without fault and without privity or knowledge on the part of petitioner. It was further alleged that petitioner feared other persons might file suits or claims as heirs at law or legal representatives of Lena May Thomas.

No freight was pending but petitioner offered to give a stipulation for the amount or value of the District's interest in the vessel and her pending freight, etc.; and, pending an appraisal, offered an ad interim stipulation in the amount of $40,760. This stipulation was authorized by the Chief Judge of this court with a proviso that application might be made to increase or diminish it later after the report of a commissioner who was appointed at the time. Monition issued and a time was set for the filing of claims. Fay Thomas Whitford, individually and in her capacity as administratrix, and Leo Thomas filed claims and answers to the petition for exoneration.

Upon pretrial the court ordered the issue of exoneration and limitation of liability to be tried first, severing the issue of damages and the value of the Nellie B and directing that they should be heard later. The pretrial order further recited that it should be without prejudice to the Road District's right to assert any and all defenses it might have to the claims asserted by the claimants.

After a hearing the court held that the Road District was not entitled to exoneration or limitation. Findings of fact and conclusions of law were filed on December 9, 1958, and are summarized as follows:

(1) that the Nellie B was unseaworthy in various respects, particularly (a) in not having an adequate number of deckhands; (b) in not having a member of the crew with a lifeboatman's certificate; (c) that the two cables at the seaward end of the runways were insufficient; (d) that the two cables were sagging below the bumper of the car; (e) a pin in one of the shackles was defective.

The court further found that the persons in charge of the Nellie B were negligent in various respects, particularly in (a) failing to have at least two deckhands on board to spot the cars and direct drivers where to stop and to "chock" the wheels of automobiles on the ferry; (b) in failing to have a crewman on board with a lifeboatman's certificate; (c) in using inadequate and defective cables across the end of the runways; (d) in failing to test the cables; (e) in failing to discover the defective pin in the shackle; and (f) in failing to discover the inadequacy of the cables. The court found that each of the items of unseaworthiness and acts of negligence was a proximate cause of the automobile going overboard, the drowning of the three people and of the injuries resulting therefrom.

The court further found that petitioner Road District was in privity and had knowledge of such unseaworthiness and negligence through Melvin Littleton, ferry superintendent charged with general management of the ferry. At the same time the court further found that Samuel J. Thomas was guilty of contributory negligence which also was a proximate cause of the injuries involved in the claims.

By stipulation all the evidence heard on the issues of exoneration-limitation was incorporated as part of the record in support of, and defense against, the Thomas claims. From that evidence and the record as a whole, the court makes the same findings as to unseaworthiness, negligence and proximate cause. In addition to the specific acts of negligence outlined above, the court finds, upon further reflection, that the ferry deckhand who directed the driver to move forward was negligent in failing to give him further instructions and in failing to direct him when and where to stop; and that each and all of said acts of negligence, except failing to have a crewman with a lifeboatman's certificate, was a proximate cause of the tragic incident giving rise to the Thomas claims.

Also, upon further reflection and reconsideration of the evidence, the Court finds that S. J. Thomas, driver of the automobile, was not guilty of contributory negligence, nor was his negligence a proximate cause of the Thomas deaths and other injuries. The previous holding, announced from the bench at the conclusion of the exoneration-limitation hearing was without consideration of the high degree of care which a ferry, although not an insurer, owes to its passengers; and, while a passenger is required to use ordinary care for his own safety, the fact that the Thomas car, easing along, after being directed to move forward by the ferry's deckhand, slipped off the deck, does not indicate that the driver reasonably should have foreseen that the thing that did happen, or some similar event, likely would occur. On the contrary, it appears more likely that S. J. Thomas, having been directed to move forward without further instructions at the time, had the right to believe that he would be directed when and where to stop; and that his failure to apply his brakes, or to apprehend his danger was due to this omission on the part of the deckhand rather than any failure on his own part to exercise ordinary care.

Leo Thomas claims damages for (1) his personal injuries and (2) the death of his wife. Fay Thomas Whitford, individually and as administratrix, claims damages for (1) the death of her mother and father; (2) the loss of the car; and (3) alternatively to the death claim, damages for conscious suffering of the parents prior to death.

The death claims are based principally upon the Texas death statute, Article 4671, Vernon's Texas Civil Statutes. The claims for personal injuries and loss of the car are based upon general admiralty law and the provisions of (1) 46 U.S.C.A. § 491, and (2) Section 1 of the Harter Act, 46 U.S.C.A. § 190.

The Road District pleads: First, that the District is not liable for tort under the statute under which it was created [1] and the decisions of the Texas courts; Second, that the Texas Death Statute, upon which claimants rely, does not create a right of action for death against counties and road districts; and (3) alternatively, the contributory negligence of Samuel J. Thomas bars all claims except those of Leo Thomas for his personal injuries.

In reply Claimants say (1) the Road District waived its sovereign immunity, if any it had, when it instituted the limitation-exoneration proceeding; (2) the Texas death statute imposes liability for negligent death upon the owner of any railroad, steamboat or other vehicle (including ferries) for the conveyance of goods or passengers, even though such owner is a county or road district; and (3) that, although contributory negligence is a complete defense under all cases decided under the Texas death statute, yet, when it is made the basis for a proceeding in admiralty, the admiralty rule applies and contributory negligence does not bar recovery but merely operates to reduce the recovery.

First: the Road District's Claim of Sovereign Immunity for Tort Not Resulting in Death:

 This is based upon two theories: (1) the fact that the section [2] of the statute [3] under which the Road District was organized provides, "no such road district * * * shall ever be held liable for torts;" and (2) the fact that a road district, being for all practical purposes a subdivision of the county,[4] is not liable for its torts since a county is not liable,[5] unless liability is created by statute, either in express terms or by necessary implication.[6]

The short answer to this contention, at least so far as the claims for tort not resulting in death are concerned, is the deeply rooted principle that a state cannot deprive a party of redress *in admiralty* against a municipality for the negligence of its servants. 1 Benedict 77, § 34, citing Workman v. New York City, 179 U.S. 552, 21 S.Ct. 212, 45 L.Ed. 314. There is a distinction between *immunity from process*, which goes to the question of jurisdiction, and *immunity from liability*, which deals with the substantive law of admiralty.[7] Where the Court has jurisdiction, as here,[8] the state may not deprive an admiralty court of the right to redress a wrong, Workman v. New York City, supra, 179 U.S. at page 566, 21 S.Ct. at page 217; or deprive a person of any substantial admiralty rights. Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 409, 74 S.Ct. 202, 98 L.Ed. 143.

1. Article 752r, Vernon's Texas Civil Statutes.

2. Art. 752r, Vernon's Texas Civil Statutes.

3. Articles 752a–752w, Vernon's Texas Civil Statutes, authorizing any county, or any political subdivision of a county, or any *road district* to issue bonds and levy taxes for the purpose of construction, maintenance and operation of roads, or "in aid thereof." Article 752c authorizes the County Commissioners' Courts to establish road districts.

4. Denton County v. Sauls, Tex.Civ.App., 265 S.W. 1091, 1093; Hill v. Sterrett, Tex.Civ.App., 252 S.W.2d 766. Neither of these cases were in tort but Denton County v. Sauls recognizes a road district's exemption from liability had it been a tort case.

5. 33 Tex.Jur. 52, § 33; 11–B Tex.Jur. 141, § 99; 21 Tex.Jur. 660, § 121.

6. Nussbaum v. Bell County, 97 Tex. 86, 76 S.W. 430, and other cases set out in footnotes to 11–B Tex.Jur. 142, supra.

7. Cf. Ex parte State of New York, No. 1, 256 U.S. 490, 41 S.Ct. 588, 65 L.Ed. 1057; Broward County, Fla., v. Wickman, 5 Cir., 195 F.2d 614.

8. Because the county may sue and be sued, 11–B, Tex.Jur. 120–123, secs. 87 and 88.

**Second: Does the Texas Wrongful Death Statute Apply to Counties and Road Districts Operating a Ferry?**

It is, of course, an established principle of maritime law that, in the absence of statute there is no remedy for death,[9] but that admiralty courts will recognize and apply state death acts.[10]

Claimants here pitch their cause of action for death principally upon Article 4671, Vernon's Texas Civil Statutes, reading as follows:[11]

"*Article 4671. 4694, 3017, 2899 Cause of action*

"No agreement between any owner of any railroad, street railway, steamboat, stage-coach, or other vehicle for transporting passengers or goods, or any industrial or public utility plant, or other machinery, and any person, corporation, trustee, receiver, lessee, joint stock association or other person in control of, or operating the same, shall release such owner, person, trustee, lessee, *corporation* or joint stock association from any liability fixed by the provisions of this article. An action for actual damages on account of the injuries causing the death of any person may be brought in the following cases:

"1. When an injury causing the death of any person is caused by the wrongful act, neglect, carelessness, unskilfulness, or default of another *person,* association of persons, joint stock company, *corporation* or trustee or receiver of any person, corporation, joint stock company, or association of persons, his, its or their agents or servants, such persons, association of persons, joint stock company, corporation, trustee or receiver, shall be liable in damages for the injuries causing such death. The

term 'corporation,' as used in this article, shall include all municipal corporations, as well as all private and public and quasi public corporations, except *counties* and common and independent school districts.

"2. When an injury causing the death of any person is caused by the wrongful act, neglect, carelessness, unskilfulness, or default of the *proprietor, owner,* charterer or hirer of any industrial or public utility plant, or any railroad, street railway, *steamboat,* stage-coach, *or other vehicle for the conveyance of goods or passengers,* or by the unfitness, wrongful act, neglect, carelessness, unskilfulness or default of his, their or its servants or agents, such *proprietor, owner,* charterer or hirer shall be liable in damages for the injuries causing such death.

"3. When an injury causing the death of any person is caused by the wrongful act, neglect, carelessness, unskilfulness or default of the receiver, trustee *or other person in charge of or in control of* any railroad, street railway, steamboat, stage-coach, or other vehicle for the conveyance of goods or passengers, or any industrial plant, public utility plant, or any other machinery, or by the wrongful act, neglect, carelessness, unfitness, unskilfulness or default of his or their *servants or agents,* such *receiver, trustee, or other person* shall be liable in damages for the injuries causing such death, and the liability here fixed against such receiver, trustee, or other person shall extend to all cases in which the death is caused by reason of any bad or unsafe condition of the railroad, street railway or other machinery under the control or operation of such receiver,

9. 1 Benedict 372, § 140, citing The Harrisburg, 119 U.S. 199, 7 S.Ct. 140, 30 L. Ed. 358 and other cases; The Tungus v. Skovgaard, 358 U.S. 588, 590, 79 S.Ct. 503, 3 L.Ed.2d 524.

10. 1 Benedict 391, § 148; The Tungus,

supra; United New York and New Jersey Sandy Hook Pilots Ass'n v. Halecki, 358 U.S. 613, 79 S.Ct. 517, 3 L.Ed.2d 541.

11. Emphasis supplied throughout this memorandum unless otherwise indicated.

852

trustee or other person, and to all other cases in which the death results from any other reason or cause for which an action may be brought for damages on account of personal injuries, the same as if said railroad, street railway or other machinery were being operated by the owner thereof. Acts 1860, p. 32; G.L. vol. 4, p. 1394; Acts 1887, p. 44; G.L. vol. 9, p. 842; Acts 1913, p. 288; Acts 1921, p. 212."

The District contends (1) no Texas statute or decision makes it liable for death; and (2) since paragraph 1 above excepts counties from the definition of "corporations," the death statute simply does not create a cause of action or a remedy for death caused by the negligence of a county or any subdivision thereof, including a road district. Claimants contend, on the other hand, that paragraph 1 applies only to death actions in general and that paragraph 2 of the statute creates a cause of action and a remedy against the proprietor or owner of a railroad, steamboat, stagecoach or other common carrier, including a ferry, whether owned by a county, a corporation or private person.

■ Although the Texas death statute has been applied by the federal courts in admiralty cases involving private parties,[12] no maritime case, federal or state, has ever discussed its application to the State, or a county or subdivision thereof. Nor has any case, maritime or otherwise, ever discussed the application of paragraph 2 of the statute to the State or one of its political subdivisions as the operator, owner, etc., of a railroad, ferry or other common carrier. This, therefore, would be a proper case for a stay until the parties could secure a construction of this seriously doubtful question of state law if it were possible and practicable; but more than two years have elapsed since the accident occurred and a state action would be barred under the applicable Texas statute of limitation.[13] This Court, therefore, must decide what construction the state courts would place on the death act under the facts here.

The Texas courts *have* consistently refused to hold either the State,[14] a county,[15] or other political subdivision of the state,[16] (other than cities), liable for negligent or wrongful death. The reasons for denial of liability in these death cases are the same as those assigned for refusal to hold the State or its political subdivisions liable for the *torts* of officers, agents or employees: (1) the general rule that, in the absence of a statute assuming liability, neither the State,[17] nor a county [18] is liable for the torts of its officers, agents or employees; and (2) generally that the activities of the State were *governmental* in nature;[19] (3) that counties are organized under general laws and are political subdivisions of the state;[20] (4) that water improvement, irrigation, navigation, drainage,

12. Truelson v. Whitney & Bodden Shipping Co., 5 Cir., 10 F.2d 412; Graff v. Parker Bros. & Co., 5 Cir., 204 F.2d 705.

13. Article 5526, subd. 7, Vernon's Texas Civil Statutes.

14. Welch v. State, Tex.Civ.App., 148 S.W. 2d 876; State v. Morgan, 140 Tex. 620, 170 S.W.2d 652; Matkins v. State, Tex. Civ.App., 123 S.W.2d 953.

15. Braissaird v. Webb County, Tex.Civ. App., 128 S.W.2d 475.

16. Bennett v. Brown County Water Improvement Dist. No. 1, 153 Tex. 599, 272 S.W.2d 498 and Karling v. Lower Colorado River Authority, Tex.Civ.App., 303 S.W.2d 495.

17. 38 Tex.Jur. 655, § 56, and authorities there cited.

18. 33 Tex.Jur. 52, § 33; 11–B Tex.Jur. 141, § 98.

19. State v. Morgan, footnote 14 supra; Powell v. State, Tex.Civ.App., 118 S.W.2d 960; State v. Isbell, 127 Tex. 399, 94' S.W.2d 423; State v. McDonald, Tex. Civ.App., 220 S.W.2d 732; Matkins v. State, supra.

20. Heigel v. Wichita County, 84 Tex. 392, 19 S.W. 562, 31 Am.St.Rep. 63; City of Galveston v. Posnainsky, 62 Tex. 118, 50 Am.Rep. 517; Braissaird v. Webb County, footnote 15 supra.

levee and improvement district, etc., are political subdivisions of the State, *performing governmental functions and standing upon the same footing as counties.*[21]

Cities were made liable for negligent or wrongful death as "municipal corporations" by an amendment adopted in 1921 [22] since the Texas courts had held that they were not "corporations" within the meaning of the death act.[23] This accounts for the provision in paragraph 1 of the statute in its present form that the word "corporation" shall include municipal corporations and excluding counties and school districts from such definition. But, even after their inclusion in the statute, it was held that cities are not liable for injuries or death caused through the negligence of their officers, employees or servants in the exercise of *governmental functions* [24] although they are liable when acting in a *proprietary capacity.*[25] Strange as it may seem, under the Texas decisions, a *city* is liable for negligence in the *building, maintenance or operation of highways* but a *county* is not; it being held as to cities that the function is *proprietary* [26] but as to counties it is *governmental.*[27] The reason for the distinction seems to be

that counties and like *quasi* corporations are created by the legislature under general laws without reference to the wishes of their inhabitants and thus for essentially public purposes, while towns and cities are incorporated through special charters which are enacted at the request of those most directly benefited by them.[28]

It is clear from all the Texas cases that neither the State nor any of its political subdivisions are liable for tort committed in the exercise of *governmental* functions. The fact that the State consents to be sued is not an admission of liability.[29] "There is a total and absolute absence of liability on the part of the State for the tortious acts of its officers, agencies and employees; and not merely a 'defense of sovereign immunity from liability,' which the State may waive," Dickerson v. State, Tex.Civ. App., 169 S.W.2d 1005, 1009.[30] This absence of liability applies in death cases irrespective of the fact that neither the State [31] nor the particular political subdivision [32] is specifically included, along with counties and school districts, in the exception from the definition of "corporations" in the Texas death statute.

21. Bennett v. Brown County Water Improvement Dist. No. 1, footnote 16 supra, and the many authorities therein cited; Karling v. Lower Colorado River Authority, footnote 16 supra.

22. H.B. 240, Chap. 109, General Laws 37th Leg., Reg. Session, p. 212.

23. Elliott v. City of Brownwood, 106 Tex. 292, 166 S.W. 1129; City of Dallas v. Halford, Tex.Civ.App., 210 S.W. 725; 33 Tex.Jur. 53, § 34. The history of the Death Act, orginally enacted Feb. 2, 1860, is one of successive amendments to meet repeated decisions by the courts drastically restricting its applicability. An excellent discussion of the history of the Act and the cases construing it, by Leon Green, Professor of Law at the University of Texas, is found in 26 Texas Law Review at page 133; see also 33 Tex.Jur. 12, § 4; Hamilton v. St. Louis, S. F. & T. Ry. Co., 115 Tex. 455, 283 S.W. 475.

24. Connally v. City of Waco, Tex.Civ.App., 53 S.W.2d 313, (death caused by negligent operation of a fire truck).

25. 33 Tex.Jur. 54, § 34.

26. Lebohm v. City of Galveston, 154 Tex. 192, 275 S.W.2d 951.

27. Heigel v. Wichita County, 84 Tex. 392, 19 S.W. 562; Lebohm v. City of Galveston, supra, citing and following City of Galveston v. Posnainsky, 62 Tex. 118, 50 Am.Rep. 517.

28. Heigel and Posnainsky, supra.

29. 38 Tex.Jur. 662–663, § 59; State v. Isbell, 127 Tex. 399, 94 S.W.2d 423; Fonseca v. State, Tex.Civ.App., 297 S.W. 2d 199.

30. Reversed on other grounds, but expressly holding the State not liable for tort, State v. Dickerson, 141 Tex. 475, 174 S.W.2d 244.

31. Welch v. State, footnote 14, supra.

32. Bennett v. Brown County Water Improvement Dist., footnote 16, supra.

854

Clearly Road District is not liable under that statute if, as a political subdivision of the State, it was exercising a *governmental* function in operating the Nellie B as a ferry. Under Texas Law this Court holds that the District was such political subdivision and was engaged in a governmental function as an agency of the State, for the following reasons:

■ First: The building, operation and maintenance of highways are governmental functions of both the State [33] and the county.[34]

■ Second: The county is a political subdivision of the state, created pursuant to general law and constitutional authority.[35] Prior to the establishment of the State Highway Department in 1917, roads and highways were, in practice, the exclusive responsibility of counties and their political subdivisions, including road districts which had (and still have) the right to issue bonds and levy taxes to retire them for, among other purposes, "the construction, maintenance and operation of macadamized, graveled or paved roads and turnpikes, or *in aid thereof*." [36] Pursuant to this constitutional power, Article 752a–752w was enacted and the Road District was created thereunder. The validity of such road districts has been recognized by the courts.[37]

■ Third: Article 2351, Vernon's Texas Civil Statutes, is one of many articles dealing with "Powers And Duties" of the commissioners' court of a county. Among these powers and duties are (1)

the establishment of precincts and justice courts; (2) establishment of *"public ferries* whenever the public interest may require;" (3) the laying out, establishment, change and discontinuance of *public roads and highways;* (4) the building and repairing of bridges; (5) the appointment of road overseers and apportionment of hands (for working the roads); and (6) the exercise of "general control over all *roads, highways, ferries* and bridges in their counties." All the foregoing powers and duties are *governmental* in nature. The power to establish ferries makes it the *duty* of the commissioners' court to do so whenever the public interest may require; and carries with it the power for the county to *create* and *operate* a public ferry, or provide and maintain the *agency* by which it is to be operated; ordinarily this is by means of licenses or franchises granted to individuals or corporations but not superior to the commissioners court to establish and operate a ferry; and this power is a *governmental* function.[38]

The close relationship of ferries to roads and highways, and "in aid thereof," is shown by the many powers and duties of the commissioners court enumerated above. It is found again in Title 116, Vol. 19, Vernon's Texas Civil Statute, "Roads, Bridges And Ferries," Articles 6663 through 6812a, containing five Chapters. The 5th Chapter deals with "Bridges And Ferries," Articles 6798–6812a, authorizing the licensing of public ferries *by the commissioners court* in the public interest, the giving of bond,

33. Powell v. State, footnote 19 supra; State v. McDonald, Tex.Civ.App., 220 S. W.2d 732; Fonseca v. State, Tex.Civ. App., footnote 29, supra; Matkins v. State, footnote 14, supra; State v. Flowers, Tex.Civ.App., 94 S.W.2d 193.

34. Heigel and Posnainsky, footnote 27 supra.

35. Art. 9, sec. 1, Texas Constitution, Vernon's Ann.St.

36. Art. 3, sec. 52, Texas Constitution; Robbins v. Limestone County, 114 Tex. 345, 268 S.W. 915. According to the interpretive commentary under Art. 3, sec.

52 of the Texas Constitution (1 Vernon's Constitution of Texas), the purpose of the amendment of Nov. 8, 1904, was to add to the state's taxing units "districts" which could be established for permanent improvements including conservation projects and *road-building* projects.

37. Cf. Dunn v. Fort Bend County, D.C. Tex., 17 F.2d 329 (Judge Hutcheson), and numerous Texas cases collected under Art. 752a.

38. Burrows v. Gonzales County, 5 Tex. Civ.App. 232, 23 S.W. 829, 830; Alabama Ferry Co. v. Leathers, 30 Tex.Civ.App. 16, 69 S.W. 117.

the rates to be charged, etc., the duties of a licensed ferryman, penalties, etc. All this shows the *governmental* nature of the county's powers and duties with reference to ferries—all derived from, and under authority of, the State.[39]

Fourth: In addition the *evidence* clearly shows that the operation of the ferry bears a close relationship to, is in aid of, and necessary to, the construction, maintenance and operation of highways, both state and county. State Highway 35 and numerous county highways lead to Aransas Pass on the Texas coast, 20 miles northeast of Corpus Christi. Private interests formerly maintained a wooden causeway across flats and water from Aransas Pass to a point on Harbor Island where automobiles and passengers were transported by ferry over the navigable waters of Corpus Christi Bay to Port Aransas on Mustang Island. For many years this was the only means of reaching Aransas Pass from the mainland. It still is the shortest and most practicable route.

In 1950 the private owners decided not to operate the causeway and ferry any longer. Mass meetings were held and the Road District was created by the commissioners court of Nueces County for the purpose of taking over and operating the causeway and three ferry boats, including the Nellie B. $400,000 in tax bonds were issued by the Road District, $250,000 being used to purchase the ferry and causeway and the balance for the improvement and building of new approaches. More than $319,000 of these tax bonds are still outstanding. The causeway and ferry system is managed by the County Engineer under authority from the commissioners court of Nueces County.

After the county took over the causeway and ferry system an asphalt highway was built along Mustang Island and on to Padre Island on the south. A causeway from the Mainland to Padre Island has made it possible for several years, including 1956 when the Thomases drowned, to make a complete circle by automobile from the mainland on the south up Padre and Mustang Islands, over the ferry to Harbor Island and thence by the causeway to Aransas Pass; or to make the same circle from the opposite direction. This has resulted in substantially increased automobile traffic at one dollar per car (the same amount charged by the private owners); but there has been little, if any, profit from ferry and causeway revenues. The outstanding bonds still are being paid off by tax money.

There can be no doubt, therefore, that under both the law and the facts the Road District was operating the Nellie B on the occasion in question in aid and as part of the highway system and in the exercise of its governmental functions; and that the Texas courts would hold that it is not liable here under the death statute.

Third: Did the District Waive its Sovereign Immunity by Instituting This Exoneration-Limitation Proceeding?

■ It must constantly be kept in mind that the Texas decisions as to sovereign immunity are not based, as are most of the cases from other jurisdictions, upon the fact that the State or its political subdivisions are not *subject to process*, but simply *that there is no liability, that the Texas Death Act does not apply to the State or its political sub-*

---

39. It is interesting to note that the Legislature is prohibited by Art. 3, section 56 of the Constitution, from passing any special or local law "Relating to *ferries* or bridges, or incorporating *ferry* or bridge companies, except for the erection of bridges crossing streams which form boundaries between this and any other State;" and that Article 12, sec. 3, provides that "The right to authorize and regulate freights, tolls, wharfage or fares * * * collected by individuals, companies or corporations for the use of *highways*, landings, wharves, bridges and *ferries*, devoted to public use, has never been and shall never be relinquished or abandoned by the State, but shall always be under Legislative control and depend upon Legislative authority."

*divisions for negligence in carrying out governmental functions.*

Claimants' very right to recover here is rooted in the Texas death act as a supplement to the general maritime law and not as a remedy to enforce a pre-existing right rooted in admirality.[40] The state act must fix liability else there is none, either at common law or in admiralty; and when admiralty adopts the state statute "as a rule of right to be administered within its own jurisdiction, it must take the right subject to the limitations which have been made a part of its existence. * * * The liability and the remedy are created by the same statutes, and the limitations of the remedy are, therefore, to be treated as limitations of the right." The Tungus, 358 U.S. 588, at page 594, 79 S.Ct. 503, at page 507.[41] So, in reality, the situation here is just that there is no death statute under which claimants can recover against the District since it was engaged in a governmental function in operating the ferry.

The cases cited by Claimants in support of their contention that the District waived its immunity are distinguishable because: (1) they involved torts and rights ordinarily enforceable under admiralty law, the only impediment being that the sovereign was *not subject to process;* and it was held that the sovereign had waived *its immunity from* process by intervention,[42] or voluntary appearance;[43] and (2) none of them involved death claims based, as here, upon state law in which the admiralty is bound by the construction of the state courts.[44]

Claimants' contention here is similar to that rejected in Tungus "that a court in a case such as this may disregard completely the conditions which the State has put upon the right it has created, and may apply instead the full corpus of the maritime law, free of any qualifications imposed by the State. If death occurs upon navigable waters within a State, the argument runs, the law should seize only upon the blunt fact that there is some kind of state statute providing some kind of a right of action for death caused by some kind of tortious conduct. That, it is said, is enough to fill the 'void' in the maritime law, which then becomes applicable in all its facets, without further inquiry as to what it is that the State has actually enacted." 358 U.S. at pages 591–592, 79 S.Ct. at page 506.

The net effect of Claimants' contention is that a petitioner for exoneration-limitation, admits *complete* liability once the petition is denied; for, claimants say, by bringing the proceeding, the Road District admits application of the death statute to it, even though that statute, as construed by the courts of the State that gives it life, does not apply. But, if filing of the petition is a bar to the defense that the statute does not apply at all, why could it not be argued just as logically that it operates as a waiver of the defense of contributory negligence, either as a complete bar or to reduce the amount of the recovery?

In Tungus and Halecki the Court accepted a construction by the Court of Appeals that New Jersey courts would apply the comparative negligence rule in

40. Cf. Byrd v. Napoleon Ave. Ferry Co., D.C.La., 125 F.Supp. 573, affirmed 5 Cir., 227 F.2d 958.

41. Quoting from The Harrisburg, 119 U.S. 199, at page 214, 7 S.Ct. 140, at page 147; see also United New York and New Jersey Sandy Hook Pilots Ass'n v. Halecki, footnote 10 supra.

42. United States v. The Thekla, 266 U.S. 328, 45 S.Ct. 112, 69 L.Ed. 313; In re United States Steel Products Co., 2 Cir., 24 F.2d 657, (collision cases).

43. People of Porto Rico v. Ramos, 232 U.S. 627, 34 S.Ct. 461, 58 L.Ed. 763, (ejectment case involving land); The Sao Vicente, 3 Cir., 295 F. 829, (libels for repairs, supplies, etc.).

44. The recent case of Petty v. Tennessee-Missouri Bridge Commission, 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804, not cited by the parties, is likewise distinguishable. It was a death action *brought under the Jones Act*, 46 U.S. C.A. § 688, against an agency of Tennessee and Missouri operating under an interstate compact approved by Congress.

admiralty cases brought under the death statute of that state. Claimants' counsel urge this court to prophesy that the Texas courts would adopt the same construction of the Texas statute. This would be a violent presumption since Texas always has adhered to the rule that contributory negligence absolutely bars recovery and that the comparative negligence doctrine does not exist except by statute in certain cases; [45] and the Court of Appeals for this Circuit has denied recovery under the Texas statute in admiralty death cases where contributory negligence was shown to be a proximate cause.[46] But, if the Road District, by bringing this proceeding, waived the right to claim that it is not covered by the Texas statute, why, by the same reasoning, did it not waive the right to plead contributory negligence either as a complete bar or to reduce the recovery proportionately?

This court does not believe that any or all of these results flow from the filing of an exoneration-limitation proceeding. There was no waiver by the Road District of the right to plead that the statute does not apply and its complete immunity from liability for death.

Is the District Liable for Death Under Federal Statutes Dealing With Safe Carriage of Passengers and Baggage?

 Claimants also contend that the district's liability "is governed by general admiralty law and federal

statutes applicable to the transportation of passengers and property upon the navigable waters of the United States," under section 491 of title 46, reading as follows:

"§ 491. Liability of master and owners for damage to passengers

"Whenever damage is sustained by any passenger or his baggage, from explosion, fire, collision, or other cause, the master and the owner of such vessel, or either of them, and the vessel shall be liable to each and every person so injured, to the full amount of damage if it happens through any *neglect* or *failure* to comply with the provisions of title 52 of the Revised Statutes, or through *known* defects or imperfections of the steaming apparatus or of the hull; and any person sustaining loss or injury through the carelessness, negligence, or willful misconduct of any master, mate, engineer, or pilot, or his neglect or refusal to obey the laws governing the navigation of such steamers, may sue such master, mate, engineer, or pilot, and recover damages for any such injury caused by any such master, mate, engineer, or pilot. R.S. § 4493."

Claimants say that the District is liable to them under the foregoing section by reason of the unseaworthiness of the Nellie B's hull and her failure to have a sufficient and competent crew,[47] but do

---

45. 30-B Tex.Jur. 340, sec. 113, citing Andrews v. Mynier, Tex.Civ.App., 190 S.W. 1164. While a common carrier of passengers is required to exercise a high degree of care, 8 Tex.Jur. 728–30, a passenger is required to use ordinary care for his own safety and contributory negligence, proximately causing the injury, will defeat a recovery. 8 Tex.Jur. 741, § 549. •

46. Truelson v. Whitney & Bodden Shipping Co. and Graff v. Parker Bros. & Co., footnote 12, supra; cf. also Cook v. Houston Direct Nav. Co., 76 Tex. 353, 13 S.W. 475, 18 Am.St.Rep. 52, holding a corporate tugboat owner liable for the drowning of a 13 year old child, on board

by invitation, who was knocked overboard when she touched and displaced some wooden billets lying on deck. The Court held, however, that recovery might be denied if (a) the child did not act with the ordinary prudence of a person of her age and intelligence; and (b) if the parents consented for her to go on board; in other words that contributory negligence would be a complete bar. There was no discussion of the Texas death statute or of maritime law. Cf. also Southern States Transportation Co. v. Ford, Tex.Civ.App., 102 S.W.2d 281.

47. Citing Hines v. Butler, 4 Cir., 278 F. 877, 880 and In re Pacific Mail S.S. Co., 9 Cir., 130 F. 76. In both of these cases

not point to any specific section of title 52 alleged to have been violated.[48] No section of that title expressly deals with unseaworthiness and the implied warrant of seaworthiness does not run to a passenger.[49]

The District says that section 491, supra, applies only to steamships, not to ferries. Section 361, however, defines steam vessels as being "Every vessel subject to inspection propelled in whole or in part by steam or by any other form of mechanical or electrical power * * * within the meaning of and subject to all the provisions of this Act. * * * "; and Section 362 provides that "All steam vessels navigating any waters of the United States which are common highways of commerce or open to general or competitive navigation, excepting public vessels of the United States, vessels of other countries, and boats propelled in whole or in part by steam for navigating canals, shall be subject to the provisions of title 52 of the Revised Statutes." This would seem to be broad enough to include ferryboats, but no specific section of title 52 is shown to have been violated and no case has

been cited expressly holding that section 491 creates a right or remedy for wrongful death of a passenger. For all that the cases dealing with death of a passenger show, the right of action could have been based upon a state statute, or the Death On the High Seas Act.[50] None of the cases, except those dealing with limitation of liability, (Hines v. Butler, The Pacific Mails, supra), discuss the provisions of title 52. While the question is close, especially in view of the attitude indicated by the Supreme Court in the recent state-operated ferry case,[51] the court holds that the claims for injuries not resulting in death arise in and are governed by maritime law while the claims for death, which occurred upon navigable waters within the State's jurisdiction, come under the Texas death statute. It follows:

(1) Claimants are not entitled to recover for the death of any of the Thomas family; (2) Claimant Leo Thomas is entitled to recover for his personal injuries, physical pain and mental suffering, as well as any impairment of earning capacity, but not for the death of his wife, her medical expenses, funeral bill,

limitation of liability was denied to the owners for injuries to and death of passengers on steamboats. In Hines v. Butler, passengers were injured as a result of a fire on the "Virginia" which plied back and forth between Baltimore and Norfolk "as one of a line which may be termed as analogous to a ferry line." In the Pacific Mail, the Rio de Janeiro struck rocks and was sunk near the Golden Gate in San Francisco Bay as it returned from Hong Kong. Both cases are to the same effect, the Court in Hines v. Butler citing the Annie Faxon, 9 Cir., 75 F. 312, also involving claims of passengers and employees killed or injured by a boiler explosion on a steamboat navigating the Snake River in Washington state. All interpreted section 491, supra, as being in pari materia with the Limitation of Liability Act (then R.S. 4493, enacted in 1871), and holding that the earlier statute "creates a general rule of limitation of liability as then existing and the later statute proceeds to make exceptions for the better security and in favor of passengers. The earlier act applies to all vessels; the later act

applies only as affording better security of life on board of steam vessels, where the risk of fire may be greater." 278 F. at page 881.

48. According to the historical note following section 170, of title 46, Revised Statutes, title 52, are now contained in sections 170, 214, 215, 222, 224, 224a, 226, 228, 229, 230–234, 239, 240, 361, 362, 364, 372, 375, 381, 391, 391a, 392, 393, 399, 400, 402–414, 416, 435, 436, 451–453, 460, 461, 462, 464, 467, 470–482, and 489–498, of title 46. These sections largely deal with inspections by the Coast Guard, issuances of licenses, etc.

49. 3 Benedict 375; Robinson on Admiralty, Ch. 11, Sec. 78, cited in Gardner v. Panama Canal Co., D.C.Canal Zone, 115 F.Supp. 687; but cf. Henson v. Fidelity & Columbia Trust Co., 6 Cir., 68 F.2d 144.

50. 46 U.S.C.A. §§ 761–768, Act of March 30, 1920, c. 111, 41 Stat. 537.

51. Petty v. Tennessee-Missouri Bridge Comm., footnote 44, supra.

etc.; (3) Claimant Fay Thomas Whitford, as executrix of the estate of her parents, is entitled to recover for (A) the value of the automobile; (B) the pain and suffering of her parents before their death.

In view of the finding that Samuel J. Thomas, the driver, was not guilty of contributory negligence, constituting a proximate cause of the tragedy, petitioner's action for contribution by his estate is dismissed.

The Court will hear further evidence in Corpus Christi on July 15, 1959, as to the amount of damages.

The Clerk will notify counsel of the entry of this memorandum.